IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| GEORGIA CASUALTY & SURETY COMPANY, as subrogee of Art Angell, Bryant Sneed, Frank McDonald, William Champion, Walt Craner, Barry Grant, Robert Kelly, Deborah Green, and Liz Borg, | * | |
| Plaintiffs, | * | |
| vs. | * | CONSOLIDATED CASE NO. 4:05-CV-87(CDL) |
| ATMOS ENERGY CORPORATION, | * | |
| Defendant. | * | |
| ***and*** | * | |
| GEORGIA CASUALTY & SURETY COMPANY, as subrogee of Woodcraft by MacDonald, Inc., Coachcraft by MacDonald, Harold Case, Philip Lambertus, Ken Kahler, Robin Corbet, Brad MacDonald, Jim Rhodes, and Larry Motos, | * | |
| Plaintiffs, | * | |
| vs. | * | |
| ATMOS ENERGY CORPORATION, | * | |
| Defendant. | * | |
| WOODCRAFT BY MCDONALD, INC., d/b/a Coachcraft by McDonald, Plaintiff-Intervenor. | * | |
| BRAD MACDONALD, Plaintiff-Intervenor. | * | |
| PROGRESSIVE INSURANCE COMPANY, as subrogee of Brad MacDonald and Robin MacDonald Plaintiff-Intervenor. | * | |

O R D E R

Presently pending before the Court is Defendant's Motion for Summary Judgment (Doc. 87). For the following reasons, Defendant's motion is granted as to Plaintiffs' claims for punitive damages and attorney fees but denied as to Plaintiffs' claim for negligence.[1]

FACTUAL BACKGROUND

Construing the evidence in the light most favorable to the Plaintiffs, as the Court is required to do at this stage of the proceedings, the Court finds that the present record establishes the following:

This litigation arises from a natural gas explosion that destroyed a building and its contents. Plaintiff/Intervenors Brad McDonald and Coachcraft by McDonald ("Coachcraft") owned the building and were responsible for its contents. At the time of the incident, Plaintiff Georgia Casualty Insurance Company ("Georgia Casualty") insured Mr. McDonald and Coachcraft under a commercial garage policy. Defendant Atmos Energy Corporation ("Atmos") owned and operated the natural-gas main that catastrophically failed, allowing gas to migrate into the Coachcraft facility and ignite.

---

[1]The Court's ruling does not depend upon the opinions of Plaintiffs' expert, Douglas C. Buchan. Therefore, Defendant's motion to exclude those opinions has no bearing on the Court's disposition of Defendant's motion for summary judgment. Since the admissibility of Mr. Buchan's testimony must be decided for trial purposes, however, the Court must decide Defendant's motion to exclude that testimony, which the Court does in a separate order.

2

On July 6, 2005, Plaintiff Georgia Casualty brought the pending action in Muscogee County State Court as subrogee of its insureds, seeking to recover the amounts paid to its insureds under their respective insurance policies.[2] On August 8, 2005, the case was removed to this Court pursuant to 28 U.S.C. §§ 1332 and 1441 *et seq.* On November 9, 2005, Plaintiff/Intervenors McDonald and Coachcraft intervened, seeking to recover for losses incurred in excess of their insurance coverage.

## I.  General Background

Gas Light Company of Columbus installed the natural gas main at issue in this case in 1957. The gas main was made from gray cast iron, an inherently brittle metal that is particularly susceptible to corrosion. Because of problems associated with gray cast iron, the material has not been installed as pipeline since the late 1950s. In 1991, the United States Department of Transportation issued a Pipeline Safety Alert recommending identification and replacement of gray cast iron pipeline. This alert was followed in 1996 by legislation recommending that natural gas operators establish plans for complete replacement of cast iron pipeline. *See* 49 U.S.C. § 60108(d).

---

[2]At least ten vehicles were damaged or destroyed in the fire. Georgia Casualty's policy covered the damage to nine of the vehicles, and Georgia Casualty paid $929,169.67 to or on behalf of the vehicles' owners: Art Angell, Bryant Sneed, Frank MacDonald, William Champion, Walt Craner, Barry Grant, Robert Kelly, Deborah Green, and Liz Borg. Plaintiff also paid $378,000 to Coachcraft and its employees as compensation for other losses incurred in the fire.

3

In 1997, Defendant took over natural gas operations in Muscogee County with the knowledge that Columbus's natural gas system contained 184 miles of cast iron main installed between 1938 and 1956. On June 15, 2000, Defendant submitted its proposed cast iron pipeline replacement plan. In April of 2001, Defendant entered into a formal agreement with the Georgia Public Service Commission ("GPSC") to replace all cast iron pipe in Columbus over a period of fifteen years. According to the plan, the priority was placed on replacing smaller-diameter pipeline, which is considered more failure-prone, before larger-diameter main. Consequently, the main at issue in this case was not scheduled to be replaced until several years after this incident occurred, although Defendant did perform routine leak surveys and pipeline patrols as required by GPSC.

## II. The Leak and Ignition

At 7:10 p.m. on February 14, 2004, Defendant received its first report of a strong odor of natural gas from an address located just over a half mile due east of the Coachcraft facility. Service technician Jerry Byrd was dispatched to respond to the call and noticed a "strong" and "pervasive" odor "everywhere" when he arrived in the neighborhood a few minutes before 8:00 p.m. (Byrd Dep. 30:1-5, Jan. 27, 2006.) Byrd immediately surmised that the odor was not emanating from any single residence and called service technician Mike Garland, supervisor Robert Gooch, and members of the construction crew to help search for the leak. For the next several

hours, Defendant received numerous complaints of gas odor from the same general area, and by 10:00 p.m., six personnel were assisting in the search. The searchers included service technicians Byrd, Gooch, Garland, Gary Goodman, and Gary Thrasher and construction department employee Kenny Roberson.[3] Roberson arrived on scene with Defendant's "go to" truck for leak response, equipped with maps identifying the shut-off valves in the Columbus gas system and a backhoe capable of unearthing up to twelve-inch mains.

Byrd, Goodman, Thrasher, and Garland spent nearly three and a half hours responding to individual residences whose occupants were complaining of gas odor. Roberson accompanied Byrd, and Gooch supervised the house-to-house investigation, despite it being apparent to the service technicians that the odor was not coming from any one particular residence. By 11:30 p.m., no leaks had been discovered. Gooch then ordered the technicians to abandon the individual house calls and instructed them to "follow their noses." (Gooch Dep. 32:13-22, Jan. 27, 2006.) At 11:55 p.m., Thrasher located the leak, which was blowing out of the ground adjacent to the Coachcraft facility. Thrasher called 911 to inform them that he was entering the property; when Gooch realized that gas was blowing into the building, a confined space with many potential ignition sources,

---

[3]Service technicians are generally responsible for turning customer meters on and off and responding to customer calls. Gooch was the supervisor in charge of twenty to twenty-five technicians. Roberson was called to assist in the search because of his familiarity with mains and service lines.

5

he also called 911 in an attempt to ascertain the owner of the building.

In the meantime, Roberson heard over his radio that Thrasher had identified the source of the leak. Within seven to ten minutes, Roberson had used the system maps in the truck to identify the proper shut-off valve. Roberson relayed this information to Gooch, who wanted to confirm Roberson's analysis by contacting Roger Garms, Defendant's operations manager. Gooch reached Garms at midnight, and although Garms understood that "time was of the essence" he did not contact Milton Anthony, lead project engineer, until nearly thirty minutes after Gooch's phone call. (Garms Dep. 30:5-32:3, 60:7-8, Jan. 27, 2006.) Garms never told Anthony that Roberson had used the on-site maps to identify the proper shut-off valve; consequently, Garms instructed Anthony to retrieve system and valve maps from Defendant's Victory Drive office. Anthony followed these instructions despite already knowing which valve would close the main. By the time Anthony finished copying the maps—which were already on the scene in Roberson's possession—gas from the leak had migrated into the Coachcraft building, which ignited at approximately 1:20 a.m. The Coachcraft building was completely destroyed as a result of the ensuing fire, and at least ten recreational and personal vehicles stored inside the facility were also damaged or destroyed. Plaintiff Georgia Casualty paid over $1.3 million to or

on behalf of the owners of the vehicles and to Coachcraft and its employees as compensation for losses incurred in the fire.

### III. **The Investigation**

The investigation of the incident revealed that the gas leak was caused by a fracture in the main gas line in an area between Bull Creek and the Coachcraft building. The natural gas escaped from the fracture, migrated along the exterior of the gas main, and ultimately entered into the Coachcraft building, where it collected and was ignited by the pilot light of a space heater located inside the building.

Experts have testified that three factors contributed to the rupture of the main. First, the line was located above a sanitary sewer line that was installed roughly thirty-five years ago. The installation and subsequent backfill of the sewer line caused the gas main to lose at least some of its support where the two utilities crossed. Second, when the Coachcraft facility was constructed, additional fill was placed in the general area of the rupture. Third, the entire circumference of the pipe had external graphitic corrosion in the area of the rupture, and in some places, twenty-five percent of the pipe's wall thickness had been lost to corrosion. Despite these contributing causes, Plaintiffs' expert testified that corrosion was the immediate proximate cause of the main's failure

because it was the only factor that had worsened in the six months preceding the incident. (Dydo Dep. 116:6-117:5, June 28, 2007.)

Plaintiffs bring this negligence action alleging, among other things, that Defendant's prevention of and response to the gas leak violated industry standards and federal regulations. Plaintiffs are seeking compensatory damages, punitive damages, and attorney fees and expenses of litigation.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This may be accomplished by showing that the nonmoving party will be unable to "establish the existence of an element essential to [the nonmoving] party's case, and on which [the nonmoving] party will bear the burden of proof at trial." *Id.* at 322.

Once the moving party has met its burden, the burden shifts to the nonmoving party to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). There is a genuine issue if the combined body of evidence,

viewed in the light most favorable to the nonmoving party, would allow a reasonable jury to find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, the relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## II. Plaintiffs' Negligence Claims

In Georgia, the burden is on the plaintiff asserting a negligence cause of action to prove four elements:

> (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.

*Bradley Ctr., Inc. v. Wessner*, 250 Ga. 199, 200, 296 S.E.2d 693, 695 (1982) (citation and quotation marks omitted). For the following reasons, the Court finds that Plaintiffs have produced evidence sufficient to create a genuine issue of material fact as to each element of their negligence claims.

### A. Duty and Breach

First, Plaintiffs must establish the existence of a legal duty to abide by a standard of care and a breach of that duty. Plaintiffs first argue that Defendant was negligent *per se* based upon its violation of various regulations included in the Federal Pipeline

9

Safety Regulations, 49 C.F.R. pt. 192.[4]  Plaintiffs also claim that even in the absence of a regulatory violation, Defendant was negligent because it failed to exercise ordinary care with regard to its prevention of and response to the gas leak.  Defendant contends that Plaintiffs' negligence claims must fail, arguing that Plaintiffs can establish neither duty nor breach because the GPSC's investigation revealed no regulatory violations.

Georgia law allows a plaintiff to adopt "a statute as a standard of conduct so that its violation becomes negligence per se." *Rockefeller v. Kaiser Found. Health Plan of Ga.*, 251 Ga. App. 699, 702, 554 S.E.2d 623, 626 (2001) (citation omitted).  "[N]egligence *per se* arises when a statute is violated, the person injured by the violation is within the class of persons the statute was intended to protect, and the harm complained of was the harm the statute was intended to guard against[.]"  *Murphy v. Bajjani*, 282 Ga. 197, 200, 647 S.E.2d 54, 58 (2007) (citation omitted).[5]  In contrast, the

---

[4]Specifically, Plaintiffs allege Defendant violated: (1) 49 C.F.R. § 192.615(a)(8) by failing to enlist the assistance of additional personnel, particularly the local fire department, during their initial search for the leak; (2) 49 C.F.R. § 192.615(a)(6) by failing to "promptly and effectively" initiate an emergency shutdown of the main; (3) 49 C.F.R. § 192.615(a)(8) by failing to notify the fire department to obtain forced entry into the Coachcraft structure; (4) 49 C.F.R. § 192.801 *et seq.* by failing to properly train and qualify its emergency responders; and (5) 49 C.F.R. §§ 192.615 and 192.605(a) by failing to maintain a proper written emergency plan.

[5]Plaintiffs clearly show (1) that they are within the class of persons the statute was designed to protect and (2) that the harm they suffered was that contemplated by the statute.  In this case, the regulations Plaintiffs claim Defendant violated are implemented pursuant to the Pipeline Safety Improvement Act of 2002.  49 U.S.C. ch. 601.  The purpose of the Act and its implementing regulations "is to provide

10

existence of regulatory violation is not necessary to maintain a cause of action for ordinary negligence. In fact, it is well-settled that mere compliance with regulations cannot relieve a defendant from liability if it is otherwise negligent. *See, e.g., Chancey v. Peachtree Pest Control Co., Inc.*, No. A07A0941, 2007 WL 3275395, at *2 (Ga. Ct. App. Nov. 7, 2007) ("'Compliance with [a statute] does not necessarily demonstrate that a defendant exercised ordinary care.'" (quoting *Sinclair Disposal Svc., Inc. v. Ochoa*, 265 Ga. App. 172, 173, 593 S.E.2d 358, 360 (2004) (alteration in original)).

Generally speaking, a jury is to determine the applicable standard of care and whether a breach of that standard occurred. *See, e.g., Hand v. Harrison*, 99 Ga. App. 429, 432, 108 S.E.2d 814, 816 (1959) (holding that even when dealing with dangerous instrumentalities, "what amounts to the exercise of ordinary care under all the circumstances is a question for the jury, but ordinary care, not extraordinary care, is still the yardstick"). This general rule also holds true in negligence *per se* cases. *See, e.g, Cruse v. Taylor*, 89 Ga. App. 611, 615, 80 S.E.2d 704, 708 (1954) ("The question of whether or not there is a [statutory] violation is for

---

adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation." 49 U.S.C. § 60102(a)(1). In light of the stated purpose of the statute under which the regulations were authorized, Plaintiffs have adequately demonstrated that they were within the class of persons meant to be protected by the statute, and the damage they suffered was contemplated by the statute.

11

the determination of the jury where the evidence is in conflict on the subject.").

In this case, Plaintiffs have produced sufficient conflicting evidence to allow a reasonable jury to conclude that Defendant's actions and inactions constituted a breach of ordinary care or a violation of the federal regulations. *See, e.g, Greason v. Kemp*, 891 F.2d 829, 835 (11th Cir. 1990) (holding that "the conflict among the experts concerning the propriety of the [defendant]'s professional judgment calls had to be resolved by the jury"). Accordingly, Plaintiffs have met their burden of demonstrating the existence of genuine issues of material fact regarding the elements of duty and breach.

B.  Causation

Regardless of whether a plaintiff is asserting negligence *per se* or ordinary negligence, a plaintiff still bears the burden to prove proximate cause and actual damages. *See Hite v. Anderson*, 284 Ga. App. 156, 158, 643 S.E.2d 550, 552 (2007) (observing that "even when negligence per se is shown, the plaintiff must still prove proximate cause and actual damage in order to recover [,] . . . [a]nd it is generally a jury question as to whether or not such negligence proximately caused the injury") (quotation marks and citation omitted) (alterations in original). In Georgia, "it is axiomatic that questions regarding proximate cause are undeniably a jury question and may only be determined by the courts in plain and

undisputed cases." *Ont. Sewing Mach. Co., Ltd. v. Smith*, 275 Ga. 683, 687, 572 S.E.2d 533, 536 (2002) (internal quotation marks and citation omitted).

In this case, the issue of proximate cause is far from "plain and undisputed," and therefore is properly a jury question. *See Harvey v. Zell*, 87 Ga. App. 280, 286, 73 S.E.2d 605, 608 (1952) (noting, in a gas explosion case where the alleged negligence was defendant's failure to comply with fire regulations, that "[w]hether these acts of negligence charged were the proximate cause of the explosion and the plaintiff's damage are questions for the determination of a jury"). Accordingly, Plaintiffs have produced sufficient evidence demonstrating a genuine issue of material fact with regard to causation.[6]

Based on the foregoing discussion, the Court finds that Plaintiffs have demonstrated the existence of genuine issues of material fact with regard to each element of their negligence claim. Accordingly, Defendant's Motion for Summary Judgment is denied as to this claim.

### III. **Attorney's Fees**

In Georgia, each party to a lawsuit is responsible for his or her own costs of litigation unless a contract or statute provides otherwise. *Harrison v. Harrison*, 208 Ga. 70, 70, 65 S.E.2d 173, 174

---

[6]The element of damage does not appear to be in dispute in this case.

13

(1950). Georgia law provides that a plaintiff may recover litigation expenses, including an award of attorney fees, "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A. § 13-6-11. While any of these three grounds are sufficient for such an award, "[w]hen a bona fide controversy exists between the parties, a plaintiff cannot cite stubborn litigiousness or unnecessary trouble and expense as proper grounds for awarding attorney fees." *Marshall v. King & Morgenstern*, 272 Ga. App. 515, 522, 613 S.E.2d 7, 13 (2005) (footnote omitted).

Based on a review of the present record, it is clear that a bona fide controversy exists. Therefore, in order to support an award of attorney fees, Plaintiffs must show that Defendant acted in bad faith with respect to the underlying transaction giving rise to the litigation—in this case, the gas leak and its consequences. *See, e.g., Sass v. First Nat. Bank of Cherokee*, 228 Ga. App. 7, 7, 491 S.E.2d 76, 77 (1997) ("Despite the existence of a bona fide controversy as to liability, a jury may find that defendant acted in the most atrocious bad faith in his dealing with the plaintiff.") (quotation marks and citation omitted).

Plaintiffs contend that Defendant exhibited "bad faith" by failing to correct regulatory violations for which it received a

14

citation in 2003.[7] Plaintiffs argue that the fact that Defendant had notice of these violations, yet failed to correct them, is evidence of "bad faith" sufficient to create a jury question on the issue of attorney fees.

"Bad faith is not simply bad judgment or negligence[.]" *Metro. Atlanta Rapid Transit Auth. v. Mitchell*, No. A07A0978, 2007 WL 3357395, at *3 (Ga. Ct. App. Nov. 14, 2007) (quoting *Rapid Group, Inc. v. Yellow Cab of Columbus, Inc.*, 253 Ga. App. 43, 49, 557 S.E.2d 420, 426 (2001)). Rather, to support an award of attorney fees based upon bad faith, a defendant's conduct must involve a "dishonest purpose or some moral obliquity." *Id.* Bad faith "implies conscious doing of wrong, and means breach of known duty through some motive of interest or ill will." *Id.* In accordance with these principles, the Georgia Court of Appeals has held that a defendant's failure to correct a hazardous condition of which it had notice is not evidence of bad faith sufficient to support an award of attorney fees. *Id.* at *2-3.

---

[7] In 2003, in Gainesville, Georgia, a gas leak exploded and destroyed a home, killing one occupant and seriously injuring another. After the Gainesville incident, the GPSC found Defendant in violation of the same regulations Plaintiffs contend were violated in this case, specifically: (1) Defendant violated 49 C.F.R. §§ 192.615 and 192.605 by failing to maintain a written emergency plan; (2) Defendant violated 49 C.F.R. § 192.605 by failing to establish contact with fire and police departments; and (3) Defendant violated 49 C.F.R. § 192.805 by failing to maintain a written operator qualification plan, resulting in Defendant's personnel not being qualified to handle "abnormal operating conditions." The gas leak at issue in this case occurred nine months after the Gainesville incident.

15

Just as in *Mitchell*, Plaintiffs have failed to show that Defendant exhibited "any interested or sinister motive, dishonest purpose, moral obliquity, conscious wrongdoing, or any other species of bad faith" aside from allegations relating to Defendant's failure to correct regulatory violations. *Id*. Plaintiffs thus have failed, as a matter of law, to allege sufficient evidence of Defendant's bad faith. Consequently, Defendant's Motion for Summary Judgment is granted as to attorney fees and litigation expenses.

## IV. Punitive Damages

Georgia law authorizes the imposition of punitive damages "only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). However, "[s]omething more than the mere commission of a tort is necessary for the imposition of punitive damages. Negligence alone, even gross negligence, is insufficient to support punitive damages." *MDC Blackshear, LLC v. Littell*, 273 Ga. 169, 173, 537 S.E.2d 356, 361 (2000) (footnote omitted).

"Whether a defendant's actions are wilful, wanton, or evince an entire want of care as to authorize punitive damages by clear and convincing evidence under O.C.G.A. § 51-12-5.1(b) is normally an issue for consideration by a jury." *Keith v. Beard*, 219 Ga. App.

16

190, 194, 464 S.E.2d 633, 638 (1995). However, when there is insufficient evidence in the record to submit the question of punitive damages to a jury, summary adjudication is proper. *See id.*, 464 S.E.2d at 639. In *Keith*, the plaintiff argued that a jury question existed on the issue of punitive damages because the defendant was on notice of an allegedly hazardous condition from a prior lawsuit, yet took no corrective action until after the plaintiff's injury. *Id.*, 464 S.E.2d at 638. The Georgia Court of Appeals held that despite this notice, "the record contains insufficient evidence to justify sending the punitive damage issue to a jury," and the court affirmed the trial court's grant of summary judgment. *Id.*, 464 S.E.2d at 639.

In this case, Plaintiffs' only contention that arguably rises above the level of gross negligence again relates to the 2003 Gainesville explosion and Defendant's alleged "conscious indifference" to the consequences of that incident. However, this case is legally indistinguishable from *Keith*. Despite the fact that the Gainesville incident may have put Defendant on notice of its potential regulatory violations, this alone has been held insufficient as a matter of law to create a jury question on the issue of punitive damages. Accordingly, Defendant's Motion for Summary Judgment is granted as to Plaintiffs' claim for punitive damages.

17

CONCLUSION

For the foregoing reasons, the Court denies Defendant's Motion for Summary Judgment (Doc. 87) as to Plaintiffs' negligence claim, but grants the motion as to Plaintiffs' claims for punitive damages and attorney fees.

IT IS SO ORDERED, this 3rd day of December, 2007.

                                                S/Clay D. Land
                                                CLAY D. LAND
                                   UNITED STATES DISTRICT JUDGE